No. 24-2179

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

CARLOS DADA, et al.,
*Plaintiffs–Appellants*,

v.

NSO GROUP TECHNOLOGIES LIMITED, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the
Northern District of California
Case No. 3:22-cv-07513 (Hon. James Donato)

_____

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS, NATIONAL NEWSPAPER
ASSOCIATION, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION,
ONLINE NEWS ASSOCIATION, PULITZER CENTER ON CRISIS
REPORTING, SOCIETY OF PROFESSIONAL JOURNALISTS, AND THE
NEW YORK TIMES COMPANY IN SUPPORT OF APPELLANTS**

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

CORPORATE DISCLOSURE STATEMENT ........................................vi

INTEREST OF AMICI CURIAE ........................................................ vii

SOURCE OF AUTHORITY TO FILE ...................................................x

FED. R. APP. P. 29(a)(4)(E) STATEMENT ..........................................x

SUMMARY OF ARGUMENT...............................................................1

ARGUMENT ......................................................................................3

    I.   The proliferation of spyware undermines press freedom worldwide...............3

    II.  In refusing to hear Plaintiffs' claims of spyware abuse, the District Court gave inadequate weight to federal policy favoring press freedom...................7

CONCLUSION ..................................................................................9

CERTIFICATE OF COMPLIANCE ....................................................11

CERTIFICATE OF SERVICE.............................................................12

# TABLE OF AUTHORITIES

**Cases**

*Compañia de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*,
970 F.3d 1269 (10th Cir. 2020) ........................................7, 9

*Contact Lumber Co. v. P.T. Moges Shipping Co.*,
918 F.2d 1446 (9th Cir. 1990) ..............................................7

*DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*,
887 F.2d 275 (D.C. Cir. 1989) ...............................................1

*Lamont v. U.S. Postmaster Gen.*,
381 U.S. 301 (1965) ................................................................6

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ................................................................3

*Shoen v. Shoen*,
5 F.3d 1289 (9th Cir. 1993) ...................................................3

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
433 F.3d 1199 (9th Cir. 2006) ..............................................8

**Other Authorities**

Alexander M. Bickel, The Morality of Consent (1975) ...........3

Bill Marczak et al., *Hacking Team Reloaded? US-Based Ethiopian Journalists Again Targeted with Spyware*,
Citizen Lab (Mar. 9, 2015),
https://perma.cc/5524-U5P7 ..................................................5

Bill Marczak et al., *New York Times Journalist Ben Hubbard Hacked with Pegasus After Reporting on Previous Hacking Attempts*,
Citizen Lab (Oct. 24, 2021),
https://perma.cc/SAU9-LY2B ................................................4

Craig Timberg, *Foreign Regimes Use Spyware Against Journalists, Even in U.S.*, Wash. Post (Feb. 12, 2014),
https://perma.cc/62SU-HUTK ...........................................1, 6

Dana Priest et al., *Private Israeli Spyware Used to Hack Cellphones of Journalists, Activists Worldwide*, Wash. Post (July 18, 2021), https://perma.cc/7UQ7-U6Y3 ............................................................. 5, 6

Danya Hajjaji, *Moroccan Independent Journalists Describe Climate of Pervasive Surveillance, Harassment*, Comm. to Protect Journalists (July 1, 2019), https://perma.cc/4KJU-Y37H ..................................................... 5, 6, 7

David Kaye, *Surveillance and Human Rights: Report of the Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, U.N. Doc. A/HRC/41/35 (May 28, 2019) ..................... 6

*Dominican Republic: Pegasus Spyware Discovered on Prominent Journalist's Phone*, Amnesty Int'l (May 2, 2023), https://perma.cc/ZD5A-NJCN ...................................................... 4

Exec. Order No. 14,093 ................................................................ 2, 8

*Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/W3WL-4QD8 (last updated Nov. 5, 2021) ................................. 3

Jeff Larson & Mike Tigas, *Leaked Docs Show Spyware Used to Snoop on U.S. Computers*, ProPublica (Aug. 8, 2014), https://perma.cc/Z4XH-KCVR ........................................................ 5

Mark Mazzetti & Adam Goldman, *Ex-U.S. Intelligence Officers Admit to Hacking Crimes in Work for Emiratis*, N.Y. Times (Sept. 14, 2021), https://nyti.ms/3wkDI5s ............................................................ 5

Phineas Rueckert, *Pegasus: The New Global Weapon for Silencing Journalists*, Forbidden Stories (July 18, 2021), https://perma.cc/J3MU-QEA7 ........................................................ 4

Press Release, Antony J. Blinken, U.S. Sec'y of State, *Announcement of a Visa Restriction Policy to Promote Accountability for the Misuse of Commercial Spyware* (Feb. 5, 2024), https://perma.cc/4NVN-66J4 ...................................................... 9

Press Release, U.S. Dep't of State, *The United States Adds Foreign Companies to Entity List for Malicious Cyber Activities*, (Nov. 3, 2021), https://perma.cc/U3J9-KCUN ................................................................9

Samuel Woodhams, *Spyware: An Unregulated and Escalating Threat to Independent Media*, Ctr. for Int'l Media Assistance (Aug. 25, 2021), https://perma.cc/B2A2-QTEF ................................................................1

*Statement by President Joe Biden on the Occasion of World Press Freedom Day 2024*, White House (May 3, 2024), https://perma.cc/KU42-QGHD ........................................................2, 7

Tim Starks, *In a First, Spyware Is Found on Phone of Prominent Russian Journalist*, Wash. Post (Sept. 13, 2023), https://perma.cc/Z9HF-DUKX/ ..........................................................5

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pulitzer Center on Crisis Reporting is a non-profit organization with no parent corporation and no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

## INTEREST OF AMICI CURIAE

Amici are the Reporters Committee for Freedom of the Press ("Reporters Committee"), National Newspaper Association, National Press Photographers Association, Online News Association, Pulitzer Center on Crisis Reporting, Society of Professional Journalists, and The New York Times Company.

The Reporters Committee is an unincorporated nonprofit association founded by journalists and media lawyers in 1970. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

National Newspaper Association is a 2,000 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Pulitzer Center on Crisis Reporting, based in Washington, DC, was founded in 2006 as a non-profit journalism center dedicated to supporting in-depth engagement with underreported global affairs through sponsorship of quality international journalism across all media platforms and a unique program of outreach and education to schools and universities. The Center supports over 150 international reporting projects each year, working in tandem with major international news outlets.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The New York Times Company is the publisher of *The New York Times* and operates the news website nytimes.com.

Together, as organizations that exercise and defend the First Amendment right to gathers the news, amici have a strong interest in protecting journalists against the use of spyware and its chilling effect.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiffs-Appellants and Defendants-Appellees have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

The unchecked proliferation of spyware "has enabled governments around the world to acquire new technologies to monitor journalists, silence independent journalism, and control the flow of information."  Samuel Woodhams, *Spyware: An Unregulated and Escalating Threat to Independent Media*, Ctr. for Int'l Media Assistance (Aug. 25, 2021), https://perma.cc/B2A2-QTEF.  These technologies and the harms they can cause defy borders:  The tools provided by commercial hacking firms have been abused to target foreign news organizations with American audiences, to compromise the communications of American journalists working overseas, and even to spy illegally on reporters within the United States. *See* Craig Timberg, *Foreign Regimes Use Spyware Against Journalists, Even in U.S.*, Wash. Post (Feb. 12, 2014), https://perma.cc/62SU-HUTK.  Those abuses undermine the United States' bedrock commitment to a free press and the free flow of information to the public.  *Cf. DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 307–08 (D.C. Cir. 1989) (Ginsburg, J., concurring in part and dissenting in part) (noting, in the First Amendment context, that "just as our flag carries its message both at home and abroad, so does our Constitution and the values it expresses" (internal citation, omissions, and alterations omitted)).

In this case, the District Court denied El Salvador's *El Faro* and its reporters a forum in the United States for their claim that they were victims of spyware

abuse, reasoning that this case is "entirely foreign." ER-007–08. But the decision below gives inadequate weight to the exceptionally strong federal policy favoring global press freedom. As President Biden recently stated: "The United States has a fundamental national security and foreign policy interest in countering and preventing the proliferation of commercial spyware," including by defending "journalists against threats to their freedom and dignity." Exec. Order No. 14,093, sec. 1. That commitment does not stop at the nation's borders. The United States has lent its weight to "support[ing] free and independent media *worldwide*" and to countering the use of spyware "to monitor journalists *worldwide*." *Statement by President Joe Biden on the Occasion of World Press Freedom Day 2024*, White House (May 3, 2024), https://perma.cc/KU42-QGHD (emphases added). Those considerations weigh heavily in favor of providing a forum in federal court in the United States for journalists who allege they were targeted or injured by spyware.

In shortchanging U.S. public policy favoring support for a free press worldwide and dismissing Plaintiffs' challenge, the District Court erred. For the reasons herein, amici respectfully urge this Court to reverse the decision below.

2

## ARGUMENT

### I. The proliferation of spyware undermines press freedom worldwide.

The confidentiality of journalists' communications is fundamental to "the integrity of the newsgathering process," and with it "the free flow of information to the public." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993). Often, sources need anonymity to confide in reporters without fear that they may—if their identities are revealed—be at risk of prosecution, loss of employment, or even threats to their lives. *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/W3WL-4QD8 (last updated Nov. 5, 2021). Government surveillance that chills those critical contacts "dam[s] the flow to the press, and through it to the people, of the most valuable sort of information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source." Alexander M. Bickel, The Morality of Consent 84 (1975). No wonder, then, that officials and governments around the world are increasingly resorting to spyware to undercut reporting that would expose official misconduct and lay "bare the secrets of government." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

This case is just one of hundreds that illustrate that risk, and NSO Group is just one firm in a thriving industry. According to one 2021 investigation by a consortium of news organizations, "[a]t least 180 journalists around the world"—

from Mexico and Morocco to Hungary and Togo—"have been selected as targets" of NSO Group's Pegasus malware. Phineas Rueckert, *Pegasus: The New Global Weapon for Silencing Journalists*, Forbidden Stories (July 18, 2021), https://perma.cc/J3MU-QEA7. And many of those intrusions also have been verified through computer forensics. For instance, Amnesty International's Security Lab determined that the cellphone of Nuria Piera, a journalist in the Dominican Republic, was infected with Pegasus three times between 2020 and 2021. *Dominican Republic: Pegasus Spyware Discovered on Prominent Journalist's Phone*, Amnesty Int'l (May 2, 2023), https://perma.cc/ZD5A-NJCN. At the time her phone was targeted, Piera "was working on sensitive, high-profile investigations," including "looking into reports of corruption related to high-ranking government officials and relatives of the nation's former president." *Id.* *New York Times* journalist Ben Hubbard also was repeatedly targeted by Pegasus spyware while reporting on Saudi Arabia and writing a book about the country's crown prince. *See* Bill Marczak et al., *New York Times Journalist Ben Hubbard Hacked with Pegasus After Reporting on Previous Hacking Attempts*, Citizen Lab (Oct. 24, 2021), https://perma.cc/SAU9-LY2B.

Other companies' tools have enabled similar abuses. The Italian firm Hacking Team has been implicated in attacks on investigative reporters in Morocco, as well as Ethiopian journalists working in the United States. *See* Danya

Hajjaji, *Moroccan Independent Journalists Describe Climate of Pervasive Surveillance, Harassment*, Comm. to Protect Journalists (July 1, 2019), https://perma.cc/4KJU-Y37H; Bill Marczak et al., *Hacking Team Reloaded? US-Based Ethiopian Journalists Again Targeted with Spyware*, Citizen Lab (Mar. 9, 2015), https://perma.cc/5524-U5P7.  Leaked documents demonstrate that the Anglo-German FinFisher spying tool has been used against the press in Bahrain.  *See* Jeff Larson & Mike Tigas, *Leaked Docs Show Spyware Used to Snoop on U.S. Computers*, ProPublica (Aug. 8, 2014), https://perma.cc/Z4XH-KCVR.  In 2021, American employees of the UAE-based DarkMatter pleaded guilty to hacking Emirati reporters.  *See* Mark Mazzetti & Adam Goldman, *Ex-U.S. Intelligence Officers Admit to Hacking Crimes in Work for Emiratis*, N.Y. Times (Sept. 14, 2021), https://nyti.ms/3wkDI5s.  And new targets are being relentlessly added to the roster.  *See* Tim Starks, *In a First, Spyware Is Found on Phone of Prominent Russian Journalist*, Wash. Post (Sept. 13, 2023), https://perma.cc/Z9HF-DUKX/.

As many of these examples illustrate, the harms that spyware proliferation poses to journalism are very far from "entirely foreign."  ER-007–08.  According to a *Washington Post* analysis in 2021, reporters working for CNN, the Associated Press, *Voice of America*, the *Wall Street Journal*, and *Bloomberg News* all appeared on the same list of Pegasus target candidates.  Dana Priest et al., *Private Israeli Spyware Used to Hack Cellphones of Journalists, Activists Worldwide*,

Wash. Post (July 18, 2021), https://perma.cc/7UQ7-U6Y3.  In other incidents, foreign governments have reached into the United States to target journalists, as when malware sold by the Italian firm Hacking Team was deployed against a Virginia-based news organization serving the Ethiopian diaspora.  *See* Timberg, *supra*.  And even in those cases where spyware targets foreign journalists working abroad, the attacks often—as here, *see* ER-024-025—misuse computers located in the United States to transmit malware to publications with a significant American audience, undermining the right of U.S. residents to receive news and information from abroad, *see Lamont v. U.S. Postmaster Gen.*, 381 U.S. 301, 307 (1965).

The gravity of the injuries that can be inflicted is difficult to overstate.  In 2019, David Kaye—then-United Nations special rapporteur on freedom of expression—warned that the misuse of spyware had been linked "to arbitrary detention, sometimes to torture and possibly to extrajudicial killings."  David Kaye, *Surveillance and Human Rights: Report of the Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, at 3, U.N. Doc. A/HRC/41/35 (May 28, 2019).  Even short of those worst outcomes, stolen information can and has been used in attempts to discredit, harass, or blackmail.  *See* Hajjaji, *supra*.  And potential sources, of course, may "refuse[] to speak to journalists" if they fear being caught up in state surveillance—depriving the public of any number of important stories.  *Id.*  In each respect, the unchecked

6

proliferation of spyware poses a grave challenge to the United States' commitment that "[j]ournalism should not be a crime anywhere on Earth." *Statement by President Biden*, *supra*.

## II. In refusing to hear Plaintiffs' claims of spyware abuse, the District Court gave inadequate weight to federal policy favoring press freedom.

In the District Court's view, Plaintiffs' claims that their reporting made them a target of illegal spyware were none of its business—even though the attack leveraged U.S. technological infrastructure, *see* ER-024-26, and even though its chilling effect on *El Faro*'s journalism undermines the First Amendment rights of its U.S. readership, *see* ER-017. That was error. The decision under review failed to take adequate stock of the strong federal policy favoring press freedom in deciding whether *El Faro*'s allegations warrant a hearing in a United States court.

When deciding whether to deny a plaintiff their chosen forum under *forum non conveniens*, courts must give due weight to "the local interest in resolving the controversy," *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1452 (9th Cir. 1990); *cf. Compañia de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1290 (10th Cir. 2020) (noting, in the context of personal jurisdiction, that "emphatic federal policy" contributes to U.S. "interest in providing a forum" even as between a foreign plaintiff and defendant (citation omitted)). And beyond the literal contours of the First Amendment, courts often have given weight to the values it communicates

when weighing whether a foreign legal system provides adequate protection for free speech and a free press. *See Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1217 (9th Cir. 2006) (per curiam) (finding the impact on Americans' First Amendment right of access to information "highly relevant to the question" whether it "would be repugnant to California public policy" to enforce foreign court orders). The same should be true here. The *forum non conveniens* analysis cannot avoid taking stock of this nation's commitment to press freedom, "one of America's, and by extension California's, most cherished public policies." *Id.* at 1239 (Fisher, J., concurring in part and dissenting in part).

The executive branch has elaborated on that commitment in the specific context presented here, emphasizing that—in light of the need to defend "journalists against threats to their freedom and dignity"—"[t]he United States has a fundamental national security and foreign policy interest in countering and preventing the proliferation of commercial spyware." Exec. Order No. 14,093, sec. 1. To similar effect, in 2021, the Biden administration added Defendant NSO Group and Candiru—another spyware company—to a trade restriction list "based on a determination that they developed and supplied spyware to foreign governments that used this tool to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers." Press Release, U.S. Dep't of State, *The United States Adds Foreign Companies to Entity*

8

*List for Malicious Cyber Activities*, (Nov. 3, 2021), https://perma.cc/U3J9-KCUN.
The State Department likewise recently announced that it would place restrictions
on "individuals believed to have been involved in the misuse of commercial
spyware, to target, arbitrarily or unlawfully surveil, harass, suppress, or intimidate
individuals including journalists."  Press Release, Antony J. Blinken, U.S. Sec'y of
State, *Announcement of a Visa Restriction Policy to Promote Accountability for the
Misuse of Commercial Spyware* (Feb. 5, 2024), https://perma.cc/4NVN-66J4.

In each respect, the United States has committed itself in the strongest terms
to the defense of reporters worldwide who have been victimized by the abuse of
spyware—an "emphatic federal policy" that deserves great weight in evaluating
the "interest in providing a forum" to Plaintiffs who allege that they, and the
American audience they reach, have been injured by those hacking tools.
*Compañia de Inversiones Mercantiles, S.A.*, 970 F.3d at 1290 (citation omitted).
The District Court's decision erroneously gives those values short shrift and should
be reversed.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reverse the
District Court's order of dismissal.

Dated: July 22, 2024                     Respectfully submitted,

                                         /s/ Bruce D. Brown
                                         Bruce D. Brown

*Counsel of Record for Amici Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
Emily Hockett
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 24-2179

I am the attorney for amici curiae the Reporters Committee for Freedom of the Press et al.

**This brief contains 2445 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature: /s/ Bruce D. Brown      Date: July 22, 2024

## CERTIFICATE OF SERVICE

I, Bruce D. Brown, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on July 22, 2024.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 22, 2024

/s/ Bruce D. Brown
Bruce D. Brown
*Counsel of Record for Amici Curiae*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS